No. 14-1330

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

―――――――――

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

H. TY WARNER,

*Defendant-Appellee.*

―――――――――

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
The Honorable Charles P. Kocoras
No. 1:13-cr-00731-1

―――――――――

## BRIEF FOR DEFENDANT-APPELLEE

―――――――――

GREGORY J. SCANDAGLIA
MICHAEL S. SHAPIRO
SCANDAGLIA & RYAN
55 East Monroe Street
Suite 3440
Chicago, IL 60603
(313) 580-2020

MARK E. MATTHEWS
CAPLIN & DRYSDALE CHTD.
One Thomas Circle NW
Suite 1100
Washington, DC 20005
(202) 862-5000

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

MICHAEL J. GARCIA
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Counsel for Defendant-Appellee*

July 9, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellee furnishes the following statement in compliance with Circuit Rule 26.1:

(1) The full name of every party that the attorney represents in the case:

H. Ty Warner

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Partners and associates of the law firms of Caplin & Drysdale, Scandaglia & Ryan, Kirkland & Ellis LLP, and Bancroft PLLC, have appeared for Defendants-Appellees in the District Court and appear for them in this Court.

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any:

N/A

ii) List any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

BANCROFT PLLC

s/Paul D. Clement
Paul D. Clement
Counsel for Defendants-Appellees

July 9, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellee furnishes the following

statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

      H. Ty Warner

(2)    The names of all law firms whose partners or associates have appeared
for the party in the case (including proceedings in the district court or
before an administrative agency) or are expected to appear for the
party in this court:

      Partners and associates of the law firms of Caplin & Drysdale,
Scandaglia & Ryan, Kirkland & Ellis LLP, and Bancroft PLLC, have
appeared for Defendants-Appellees in the District Court and appear for
them in this Court.

(3)    If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any:

        N/A

    ii)    List any publicly held company that owns 10% or more of the
party's or amicus' stock:

        N/A

                  BANCROFT PLLC

                  s/Erin E. Murphy
                  Erin E. Murphy
                  Counsel for Defendants-Appellees

July 9, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellee furnishes the following statement in compliance with Circuit Rule 26.1:

(1) The full name of every party that the attorney represents in the case:

H. Ty Warner

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Partners and associates of the law firms of Caplin & Drysdale, Scandaglia & Ryan, Kirkland & Ellis LLP, and Bancroft PLLC, have appeared for Defendants-Appellees in the District Court and appear for them in this Court.

(3) If the party or amicus is a corporation:

    i) Identify all its parent corporations, if any:

        N/A

    ii) List any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

SCANDAGLIA & RYAN

s/Gregory J. Scandaglia
Gregory J. Scandaglia
Counsel for Defendants-Appellees

July 9, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellee furnishes the following

statement in compliance with Circuit Rule 26.1:

(1)     The full name of every party that the attorney represents in the case:

        H. Ty Warner

(2)     The names of all law firms whose partners or associates have appeared
        for the party in the case (including proceedings in the district court or
        before an administrative agency) or are expected to appear for the
        party in this court:

        Partners and associates of the law firms of Caplin & Drysdale,
        Scandaglia & Ryan, Kirkland & Ellis LLP, and Bancroft PLLC, have
        appeared for Defendants-Appellees in the District Court and appear for
        them in this Court.

(3)     If the party or amicus is a corporation:

        i)      Identify all its parent corporations, if any:

                N/A

        ii)     List any publicly held company that owns 10% or more of the
                party's or amicus' stock:

                N/A

                                SCANDAGLIA & RYAN

                                s/Michael S. Shapiro
                                Michael S. Shapiro
                                Counsel for Defendants-Appellees

July 9, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellee furnishes the following

statement in compliance with Circuit Rule 26.1:

(1)    The full name of every party that the attorney represents in the case:

    H. Ty Warner

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Partners and associates of the law firms of Caplin & Drysdale, Scandaglia & Ryan, Kirkland & Ellis LLP, and Bancroft PLLC, have appeared for Defendants-Appellees in the District Court and appear for them in this Court.

(3)    If the party or amicus is a corporation:

    i)    Identify all its parent corporations, if any:

        N/A

    ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

                CAPLIN & DRYSDALE CHTD.

                s/Mark E. Matthews
                Mark E. Matthews
                Counsel for Defendants-Appellees

July 9, 2014

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendants-Appellee furnishes the following statement in compliance with Circuit Rule 26.1:

(1)     The full name of every party that the attorney represents in the case:

   H. Ty Warner

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Partners and associates of the law firms of Caplin & Drysdale, Scandaglia & Ryan, Kirkland & Ellis LLP, and Bancroft PLLC, have appeared for Defendants-Appellees in the District Court and appear for them in this Court.

(3)     If the party or amicus is a corporation:

   i)     Identify all its parent corporations, if any:

        N/A

   ii)    List any publicly held company that owns 10% or more of the party's or amicus' stock:

        N/A

KIRKLAND & ELLIS, LLP

s/Michael J. Garcia
Michael J. Garcia
Counsel for Defendants-Appellees

July 9, 2014

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT .......................................... i

TABLE OF AUTHORITIES ............................................................. viii

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF THE ISSUE ....................................................... 1

STATEMENT OF THE CASE ......................................................... 1

    A.    Mr. Warner's Unique History and Characteristics........................ 3

    B.    The Underlying Offense ................................................. 9

    C.    Sentencing Proceedings ............................................... 13

SUMMARY OF ARGUMENT .......................................................... 21

ARGUMENT ....................................................................... 25

I.    District Courts Possess Extremely Broad Sentencing Discretion, And The Sentences They Impose May Be Held Substantively Unreasonable Only In The Narrowest Of Circumstances ..................................................... 25

II.    Mr. Warner's Sentence Is Substantively Reasonable ........................... 30

    A.    The District Court Expressly and Appropriately Considered the Relevant Sentencing Factors ............................. 30

    B.    The District Court Neither Considered Impermissible Factors Nor Placed Impermissible Weight on Any Factors It Considered ................................................. 34

    C.    Mr. Warner's Sentence Is Consistent with Analogous Cases and Does Not Cause Unwarranted Sentencing Disparities ................................................. 48

CONCLUSION .................................................................... 57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ...................................................*passim*

*Green v. Berge*, 354 F.3d 675 (7th Cir. 2004) ................................................... 55

*Griffin v. Wisconsin*, 483 U.S. 868 (1987) ......................................................... 55

*Kimbrough v. United States*, 552 U.S. 85 (2007) ............................................. 34

*Koon v. United States*, 518 U.S. 81 (1996) ......................................................... 27

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*,
    667 F.3d 910 (7th Cir. 2012) ........................................................................ 25

*Peugh v. United States*, 133 S. Ct. 2072 (2013) ................................................ 34

*Rita v. United States*, 551 U.S. 338 (2007) ........................................................ 25

*Rodriguez v. Anderson*, 973 F.2d 550 (7th Cir. 1992) ..................................... 29

*United States v. Abebe*, 651 F.3d 653 (7th Cir. 2011) ...................................... 28

*United States v. Annoreno*, 713 F.3d 352 (7th Cir. 2013) .......................... 28, 54

*United States v. Bistline*, 665 F.3d 758 (6th Cir. 2012) ................................... 45

*United States v. Booker*, 543 U.S. 220 (2005) ................................................... 26

*United States v. Bradley*, 628 F.3d 394 (7th Cir. 2010) ................................... 26

*United States v. Carter*, 538 F.3d 784 (7th Cir. 2008) .................. 27, 28, 29, 34

*United States v. Chapman*, 694 F.3d 908 (7th Cir. 2012) ............................... 40

*United States v. Cranley*, 350 F.3d 617 (7th Cir. 2003) ................................... 55

*United States v. England*, 555 F.3d 616 (7th Cir. 2009) .................................. 26

*United States v. Engle*, 592 F.3d 495 (4th Cir. 2010) ................................. 43, 44

*United States v. Knights*, 534 U.S. 112 (2001) ................................................. 55

*United States v. Lucas*, 670 F.3d 784 (7th Cir. 2012) ...................................... 29

*United States v. Marin-Castano*, 688 F.3d 899 (7th Cir. 2012)........... 35, 42, 45

*United States v. Miller*, 601 F.3d 734 (7th Cir. 2010)...................................... 26

*United States v. Omole*, 523 F.3d 691 (7th Cir. 2008) .................................... 26

*United States v. Peppel*, 707 F.3d 627 (6th Cir. 2013) .................................... 45

*United States v. Repking*, 467 F.3d 1091 (7th Cir. 2006) ................... 26, 41, 42

*United States v. Reyes-Hernandez*, 624 F.3d 405 (7th Cir. 2010) ................. 53

*United States v. Roberson*, 474 F.3d 432 (7th Cir. 2007 ................................ 26

*United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010).......................... 37, 39

*United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007)............. 2, 25, 34, 57

*United States v. Wallace*, 458 F.3d 606 (7th Cir. 2006).................................. 26

**Statute**

18 U.S.C. § 3553(a) ....................................................................................*passim*

**Other Authorities**

*Department of Justice Criminal Tax Manual* (2012) ................................................ 12

Judgment & Commitment, *United States v. Olenicoff*,
    No. 07-CR-227 (C.D. Cal. Apr. 16, 2008) .................................... 51

Judgment, *United States v. Homann*,
    No. 09-CR-724 (D.N.J. Jan. 6, 2010)............................................ 50

Judgment, *United States v. Robbins*,
    No. 10-CR-333 (S.D.N.Y. Oct. 8, 2010) ....................................... 51

Judgment, *United States v. Rubinstein*,
    No. 09-CR-60166 (S.D. Fla. Oct. 28, 2009) ................................. 50

Judgment, *United States v. Silva*,
    No. 10-CR-44 (E.D. Va. June 11, 2010) ....................................... 50

Judgment, *United States v. Vogliano*,
    No. 10-CR-327 (S.D.N.Y. Apr. 26, 2011)...................................... 51

Judgment, *United States v. Zabczuk*,
No. 10-CR-60112 (S.D. Fla. July 27, 2010)................................... 49

Statement from IRS Comm'r Doug Shulman on Offshore Income, IRS.gov
(Mar. 26, 2009), http://1.usa.gov/1pYbzrj ........................................ 11

Tr. of Sentencing Hearing 17, *United States v. Curran*,
No. 12-CR-80206 (S.D. Fla. Apr. 25, 2013)................................... 49

U.S. Sentencing Comm'n, *2011 Sourcebook of Federal Sentencing
Statistics* Table 59 (2012), http://bit.ly/1rO9opX....................... 26

U.S. Sentencing Comm'n, *2012 Sourcebook of Federal Sentencing
Statistics* Table 59 (2013), http://bit.ly/VGtF3j ......................... 26

U.S. Sentencing Comm'n, *2013 Sourcebook of Federal Sentencing
Statistics* Table 59 (2014), http://bit.ly/1oFflCc........................... 26

## JURISDICTIONAL STATEMENT

The government's jurisdictional statement is complete and correct.

## STATEMENT OF THE ISSUE

H. Ty Warner pled guilty to a single count of tax evasion in connection with failure to report an offshore bank account. As part of his plea agreement, Mr. Warner agreed to pay all back taxes plus interest, as well as a $53 million civil penalty—the largest publicly reported penalty that had ever been imposed for failure to report an offshore account. After considering the Sentencing Guidelines, the factors enumerated in 18 U.S.C. § 3553(a), the full record, and the detailed written and oral arguments of both parties, the District Court sentenced Mr. Warner to two years of probation, 500 hours of community service, and over $100,000 in criminal penalties. The sole issue in this appeal is whether that sentence is substantively reasonable.

## STATEMENT OF THE CASE

The appeal involves a challenge to the substantive reasonableness of the sentence the District Court imposed. In other words, the government does not dispute that the District Court correctly calculated the Sentencing Guidelines range, considered all the statutorily enumerated sentencing factors, and adequately explained its reasons for imposing the sentence it did. Instead, the government contends only that the court abused its discretion in sentencing Mr. Warner to probation—the same sentence imposed in more than half the

offshore banking cases the government has opted to prosecute—rather than a term of incarceration. That makes the government's burden on appeal a daunting one, as it is bedrock law that a District Court's sentencing determination is entitled to considerable deference and may be reversed only in the rare case when it falls outside "the broad range of objectively reasonable sentences in the circumstances" at hand. *United States v. Wachowiak*, 496 F.3d 744, 754 (7th Cir. 2007).

This is not that rare case. After carefully considering the extensive evidence and arguments presented by the parties, the District Court found "Mr. Warner to be a very unique individual," S.Tr. 38, for whom a sentence of probation and community service was sufficient to serve the objectives Congress has established to guide sentencing determinations.[1] In making that determination, the court clearly followed the factors set forth in section 3553(a) and provided a detailed and reasoned explanation for its conclusions. The sentence it imposed is hardly an outlier, as probation sentences are commonplace in offshore account cases. In short, the District Court acted well within the bounds of its considerable discretion.

---

[1] Record citations in this brief employ the same abbreviations as in the government's brief. *See* Govt.Br. 1 n.1.

### A.    Mr. Warner's Unique History and Characteristics

H. Ty Warner is a self-made man with a generous heart.  He emerged from a troubled and unhappy childhood, devoid of any educational advantages, to become one of this country's most successful entrepreneurs.  Even as the Beanie Baby phenomenon brought him substantial financial fortune, Mr. Warner never lost sight of his commitment to giving back.  Indeed, both his professional and his personal life have been marked by extraordinary acts of kindness and generosity through which he has shared not just his wealth, but his time and talents, with those in need.

1. Mr. Warner was born into a very difficult family life in Chicago, Illinois.  *See* Presentence Report ("PSR") ¶¶ 44-47.  After high school, he worked several menial jobs to try to earn enough money to attend college.  He ultimately enrolled at Kalamazoo College in 1962 but was forced to drop out after one year because he could no longer afford tuition.  App. 25.  Unable to return to his home or to school, Mr. Warner took whatever jobs he could find to make ends meet, working as a busboy, a bellman, a valet car parker, a fruit market vendor, and a door-to-door salesman.  *Id.*

Eventually, Mr. Warner settled in as a sales representative for the Dakin Toy Company, where he developed both the passion and the confidence that ultimately would lead to his extraordinary business success later in life.  *Id.* at 26. Dakin manufactured figurines and stuffed animals—or, as they are known

3

in the industry, "plush toys." *Id.* at 3. Mr. Warner quickly developed a love for selling toys to children, as well as a keen sense of what particular plush toys children enjoyed. *Id.* Within only a few years, he became Dakin's top salesman. *Id.*

In 1985, Mr. Warner set out on his own and formed a plush toy company that he named Ty Inc. *Id.* In the early years, Ty Inc. was a very small operation. *Id.* The company had no employees and was run entirely out of Mr. Warner's condominium. *Id.* Mr. Warner personally designed, promoted, and shipped every one of the toys Ty Inc. sold. *Id.* He had all inventory delivered to his condominium, and when orders came in, he filled them himself, packing the boxes and driving them to the post office for delivery. *Id.*

In the early 1990s, Ty Inc. introduced a product that would go on to transform the plush toy industry: the Beanie Baby. *Id.* The basic concept behind the Beanie Baby was simple. Mr. Warner wanted to design a product that would be manufactured to extremely high-quality standards, but inexpensive enough that a child could afford it, and small enough that it could fit in a child's backpack or coat pocket. *Id.* The result was a spectacular success—due in large part to Mr. Warner's exceptional and constant attention to design details, making the final decision on everything down to the particular fabric or color of every Beanie Baby the company released. *Id.*

2. The personal challenges Mr. Warner faced on his path to success have led to a lifelong commitment to helping others overcome obstacles in their own lives. As the dozens of letters submitted to the District Court on Mr. Warner's behalf recounted in detail, concern for and generosity toward others have been the hallmarks of both his personal and his professional life.[2]

For instance, a woman named Jennifer Vasilakos recalled how she was in a parking lot trying to raise funds for a life-saving kidney procedure when Mr. Warner drove up to ask for directions. *See* Vasilakos Letter; App. 28; S.Tr. 40-43. Ms. Vasilakos provided the directions and handed Mr. Warner a flyer, and he initially drove off. About an hour later, after reading her flyer, Mr. Warner returned and offered to help by giving Ms. Vasilakos the entire $20,000 she still needed for her treatment. But his "generosity went further than simply donating" money to this total stranger. S.Tr. 42. Mr. Warner helped Ms. Vasilakos "network to get [her] story out there" and "raise awareness about" her form of treatment through social media and a blog. S.Tr. 42. Through Mr. Warner's assistance, she was able to meet with specialists and has even "altered the path of research" such that it is now "advancing exponentially." S.Tr. 42. As Ms. Vasilakos put it, Mr. Warner's "philanthropic

---

[2] The probation officer assigned to this case provided the letters to the parties, then filed them with the District Court under seal at Docket Entries 22, 23, and 27. Those docket entries have been filed under seal with this Court as the Supplemental Record on Appeal (CA7 Doc. 4).

actions have not only changed my life, they've trickled down to change the lives of countless others." S.Tr. 42.

Mr. Warner's relationships with his employees have been marked by the same personal kindness and generosity. Chris Johnson, who has worked for Mr. Warner for two decades since he was 18 years old, told of how Mr. Warner let him live in his own home rent-free when Mr. Johnson was a college student and part-time employee struggling to make ends meet. *See* App. 28; Johnson Letter. Mr. Johnson explained how Mr. Warner's acts have taught him that "generosity was not only a monetary thing," and that "being kind and helping others" is every bit as important. *Id.* Indeed, Mr. Johnson has come to view Mr. Warner as a "second father." *Id.* In Mr. Johnson's words: "The values that Ty has showed me beyond my natural parents are what has helped me to be the father and man that I have become." *Id.*

Stories of such personal kindnesses abound from Mr. Warner's past and present employees. Many recount Mr. Warner's personal concern and involvement when they encountered obstacles in life. When one employee had to undergo a series of surgeries to correct a serious problem with his eye in 2005, Mr. Warner arranged for him to be evaluated by an expert on his condition at Johns Hopkins, and also gave him more than six months of leave from work. *See* App. 28; Grana Letter. Without Mr. Warner's help, the employee would not have been able to see a specialist at all. *See id.* When Mr.

6

Warner learned that the son of one of his employees in China had contracted a rare infection that interfered with brain and limb function, Mr. Warner arranged for the boy to come to the United States with his parents and be evaluated at the Mayo Clinic. App. 28; Swallow Letter. A former Ty Inc. employee told of how Mr. Warner personally researched the best doctor for an employee diagnosed with cancer and allowed a local police officer to use one of Ty Inc.'s warehouses to start a dog-training business. App. 28-29; Altier Letter. In short, whether it be by helping his employees, his former colleagues, or even total strangers, Mr. Warner has made a positive difference in the lives of the people around him.

3. Mr. Warner has been very generous with his considerable fortune as well. Since 1995, he has donated nearly $140 million in cash and toys to various charities and organizations, including multi-million-dollar gifts to assist underprivileged children, the Red Cross, pediatric AIDS funds, and many other worthy causes. *See* App. 33; S.Tr. 47. But with these organizations as well, to Mr. Warner, charity consistently has been about more than just sharing his wealth. It is also about sharing his time and talents.

Mr. Warner's involvement in the development of a park in Westmont, Illinois, is illustrative. After acquiring a vacant lot near Ty Inc.'s headquarters, the Village of Westmont lacked sufficient funds to develop the property into the modest park it envisioned. App. 34. When Mr. Warner

stepped in to help, he did not stop with committing more than $12 million to the development and ongoing operation of the park. *Id.*; S.Tr. 44. Instead, Mr. Warner became personally involved in the design and creation of the park, and saw this multi-year project through with his characteristic attention to detail. App. 34. Indeed, Mr. Warner's "involvement grew to the point where he became the visionary for the project." *Id.* (quoting Gunter Letter).

The same personal approach to charitable works is evident in Mr. Warner's efforts to help raise funds for a naval crew in the Santa Barbara community where his hotel and resort interests are headquartered. Stanley Los, a retired 25-year veteran of the FBI, met Mr. Warner while attempting to raise funds for the crew of the USS Ronald Reagan (CVN-76) as part of his work for the Santa Barbara Council of the Navy League. Los Letter; App. 34. Mr. Warner suggested that he design a Beanie Baby dedicated to former President Ronald Reagan and dedicate 100% of the profits to the ship's crew. *Id.* After a successful sales run, Mr. Warner presented the Navy League with a check for $750,000 to be used for the benefit of the ship's crew. *Id.* at 34-35. Mr. Warner also donated another 24,000 of the commemorative Beanie Babies for the crew's Morale, Welfare and Recreation Fund. *Id.* at 35. Over the years, Mr. Warner has used the same concept to raise funds for several charitable causes, dedicating proceeds from the sales of Beanie Babies that he personally

designed to organizations such as the Elizabeth Glaser Pediatric AIDS Fund, the American Red Cross, and the Susan G. Komen Race for the Cure. *Id.*

Mr. Warner has undertaken many of these acts with little fanfare, and typically seeks no recognition for or personal benefit from his actions. For instance, Mr. Warner has donated over $70 million worth of plush toys to the Children's Hunger Fund, which has been able to distribute these toys to children "in orphanages, cancer treatment facilities, hospitals, slums and villages, inner cities, poor rural areas and disaster-stricken areas." S.Tr. 45; App. 35; Phillips Letter. Notwithstanding the organization's repeated inquiries, Mr. Warner always has declined to have his extraordinary contributions publicized, content just to provide happiness and hope for children without attempting to promote himself or his business. S.Tr. 46. Nor were Mr. Warner's actions motivated by financial or tax considerations. Indeed, Mr. Warner has not even taken available tax deductions for many of his contributions; over the years, he has left more than $16 million in potential tax deductions unused. App. 36.

## B.     The Underlying Offense

In January 1996, Mr. Warner made a bad decision. At age 51, for the first time in his life, Mr. Warner unexpectedly found himself with substantial wealth, and Swiss financial advisers (now indicted fugitives) counseled him to open a Swiss bank account. App. 30. These advisers helped Mr. Warner create

and open an account at UBS in January 1996. *Id.* For the following several years, Mr. Warner failed to report this foreign account on his tax returns. In 2002, the same Swiss financial advisers counseled Mr. Warner to allow them to transfer the account's funds out of UBS. *Id.* Mr. Warner received periodic oral updates regarding the account and was aware that it was generating income. *Id.* Unlike the majority of similarly situated account-holders, however, he never used—or even withdrew—any funds from the account. *Id.*

In 2009, Mr. Warner learned of the government's investigations into offshore accounts generally. *Id.* Although he received no notice from the government or from any Swiss bank that he might be a target of those investigations, he became aware of the government's widely publicized interest in UBS and the indictment of a banker Mr. Warner had dealt with, who had become a fugitive. *Id.* Mr. Warner thus contacted his long-time attorney to see if there was a way to return to full compliance and rectify his failure to report the Swiss account. *Id.* His attorney advised him of the IRS's offshore voluntary disclosure initiative, which enabled taxpayers who voluntarily disclosed their offshore accounts to pay back taxes, interest, and a penalty without facing criminal prosecution. *Id.*

The voluntary disclosure initiative has been repeatedly and widely touted by former Commissioner Douglas Shulman as a safe and advantageous

way to resolve prior tax non-compliance.  In announcing the first of three IRS disclosure programs, the Commissioner stated:

> My goal has always been clear—to get those taxpayers hiding assets offshore back into the system. … [W]e draw a clear line between those individual taxpayers with offshore accounts who voluntarily come forward to get right with the government and those who continue to fail to meet their tax obligations.  People who come in voluntarily will get a fair settlement. … Those who truly come in voluntarily will pay back taxes, interest and a significant penalty, but can avoid prosecution.

Statement from IRS Comm'r Doug Shulman on Offshore Income, IRS.gov (Mar. 26, 2009), http://1.usa.gov/1pYbzrj.  Consistent with 60 years of IRS voluntary disclosure policies, the offshore disclosure initiative created in 2009 was available only to non-compliant taxpayers who came forward before being audited or investigated by the IRS.

In September 2009, Mr. Warner applied to enter the program.  App. 30. Because he was neither under audit nor aware that he was a target of any investigation, he fully expected to be admitted and receive the same opportunity to right his past wrongs that tens of thousands of similarly situated individuals have received.  Unbeknownst to Mr. Warner or his counsel, however, Mr. Warner apparently had been included on a list of 285 names provided by UBS in secret to the Department of Justice as part of UBS's efforts to avoid criminal prosecution in the United States.  *Id*. at 31-32, n.3.

Accordingly, on October 22, 2009, Mr. Warner learned that his application had been rejected. *Id.* at 32.

Nevertheless, Mr. Warner still sought to rectify his mistake. He authorized his counsel to approach the Department of Justice and the lead prosecutor in the offshore account cases to request an opportunity to make a full disclosure pursuant to a Tax Division voluntary disclosure practice. *See Department of Justice Criminal Tax Manual* § 4.01 (2012); App. 32. Neither the IRS nor the Department of Justice provided any substantive response to these repeated requests. *Id.* Two years later, in September 2011, a grand jury subpoenaed Mr. Warner's offshore banking records, thus compelling him to turn over to the government all the evidence it would need to prosecute him for failure to report and pay taxes on the offshore account. *Id.*

In October 2013, Mr. Warner pled guilty to one count of tax evasion for his amended 2002 calendar year tax return filed in 2007. App. 1. Pursuant to the plea agreement, Mr. Warner agreed to file amended tax returns and pay back taxes and interest. *Id.* at ¶ 12. In addition, Mr. Warner agreed to pay the government a $53,552,248 penalty, which was calculated based on 50% of the highest balance of the unreported offshore account during the relevant years—*i.e.*, the highest civil penalty Mr. Warner could have faced for his failure to report the account during any of those years. *Id.* at ¶ 15. To our knowledge, it is also the largest such penalty that has ever been imposed or paid. It far

exceeds the 20% penalty imposed on individuals accepted into the offshore voluntary disclosure initiative at the time that Mr. Warner applied to the program, and it is nearly ten times the agreed-upon $5.5 million tax loss that resulted from Mr. Warner's failure to report his account.

Since voluntarily disclosing his wrongdoing, Mr. Warner has taken full responsibility for his crime. He understands the gravity of his offense and has admitted his culpability. After pleading guilty, and before his sentencing hearing, Mr. Warner "fully complied with all of the terms of the plea agreement." S.Tr. 49-50. He paid back taxes, interest, and penalties on the omitted income; he filed amended tax returns for the agreed-upon years; and he paid the $53 million penalty. *See* S.Tr. 49.

## C. Sentencing Proceedings

Although the back taxes and civil penalty were part of Mr. Warner's plea agreement, the plea did not include any agreed-upon criminal sentencing recommendation. But the parties did agree on a number of issues relevant to sentencing. First, the applicable offense level and Sentencing Guidelines range were undisputed. The parties agreed that Mr. Warner's offense level, before applying any reductions for acceptance of responsibility, was 26. They also agreed that the offense level should be reduced by two levels for acceptance of responsibility and by an additional one level for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b). Based on these reductions, Mr. Warner's final

adjusted total offense level was 23, resulting in an advisory Guidelines range of 46-57 months.  S.Tr. 3; *see also* PSR ¶ 30.

Neither party proposed, however, that the District Court impose a sentence anywhere near this Guidelines range.  Mr. Warner requested a sentence of probation and community service, which is the same kind of sentence that has been imposed in almost two-thirds of the offshore tax cases the government has prosecuted.  S.Tr. 22.  The government argued generically for "a term of incarceration in excess of a year and a day," *id.* at 20, which is at the high end of the sentences imposed in offshore tax cases and well below the applicable Sentencing Guidelines range.  Accordingly, as presented by the parties, the question for the District Court was not whether to impose a sentence below the Guidelines range, as neither party suggested that a Guidelines sentence was warranted.  Instead, the basic dispute was over whether to impose a sentence that included any incarceration at all.  *See* S.Tr. 22.

Mr. Warner and the government both articulated in detail the legal and factual bases for their recommendations in extensive sentencing memoranda.  In urging the District Court to impose probation with community service, Mr. Warner stressed that he accepted responsibility for his crime.  App. 38.  He explained how he attempted to join the IRS voluntary disclosure program, only to learn that he was already under investigation and thus ineligible for the

non-prosecution treatment that the government had afforded tens of thousands of similarly situated individuals. *Id.* at 38-40.

In addition, Mr. Warner provided evidence that most of the individuals the government has chosen to prosecute based on their non-disclosure of offshore accounts have received probation sentences, thus demonstrating that a probation sentence most often is considered sufficient to provide adequate punishment and deterrence and would create no unwarranted sentencing disparity. App. 61 (chart of sentences in other offshore tax cases). Mr. Warner also noted that the government would achieve a great deal of deterrence on account of Mr. Warner's very public prosecution and the unprecedented $53 million civil penalty he had paid. App. 46; S.Tr. 33. Finally, Mr. Warner argued that his life-long history of personal kindness, generosity, and charity demonstrates that society would be better served by a sentence of probation and significant community service than by incarcerating him. App. 43-44, 49-50.

For its part, the government presented many of the same arguments it presses now on appeal. It urged the court to focus on the size of Mr. Warner's offshore account and the tax loss that resulted from its non-disclosure, and insisted that Mr. Warner's unique characteristics and circumstances could not mitigate this "serious offense." App. 77. While recognizing that Mr. Warner has led "an otherwise law abiding existence," *id.* at 81, presented no risk of

recidivism, and engaged in significant charitable works, the government characterized the financial components of those works as "hardly exceptional," *id.* at 83, given his wealth, and contended that the court should not allow the size of any charitable contributions to affect his sentence.

Although the government acknowledged that there is "no evidence that [Mr. Warner] knew he was under criminal investigation at the time of disclosure," *id.* at 85, it also contended that the court should not consider his attempt to enter the IRS voluntary disclosure program a mitigating factor given his ineligibility. Likewise, the government urged the court not to consider the fact that participants in this program are not criminally prosecuted at all when determining what kind of sentence would be "sufficient, but not greater than necessary, to comply with the purposes," 18 U.S.C. § 3553(a), that Congress has articulated to guide sentencing determinations. App. 80-81, 84-87.

In addition, the government insisted that Mr. Warner's record-setting civil fine provided neither sufficient punishment nor sufficient deterrence, and that wealthy individuals who can afford to pay high fines should have to serve prison time to underscore the seriousness of their offenses. *Id.* at 88-89. Finally, while the government "acknowledge[d] that [a] number of defendants who were convicted of [similar] crimes … were given probationary terms," *id.* at 93, it contended that incarceration was necessary to avoid unwarranted

sentencing disparities given the size of Mr. Warner's foreign account and tax loss, and the government further attempted to distinguish the many cases in which it has agreed to or acquiesced in probation sentences as involving lower tax losses, more substantial cooperation, or older defendants. *Id.* at 93-94.

After the parties pressed these arguments again during an extensive sentencing hearing, the District Court announced its sentence and supporting reasoning. The court began by noting that "[t]he issues ha[d] been strikingly framed" by the parties' written and oral advocacy, which the court characterized as "excellent." S.Tr. 39. The court also explained that it found "Mr. Warner to be a very unique individual[,] [n]ot only in terms of the criminality that he has engaged in, which was not insubstantial, but his services and kindness to mankind, all of which was done without a view toward using it at sentencing." S.Tr. 38.

Emphasizing that "the starting point for [the] analysis is the sentencing statute itself," S.Tr. 38, the court walked through its analysis of the factors section 3553(a) instructs courts to consider. The court noted that "[t]he statute is broad and makes relevant the non-criminal conduct of the defendant" and that "there are some principles extraneous to the acts of the defendant, which are fundamental to any system of criminal justice." S.Tr. 38-39. Among these factors are "the dignity of the law and the respect which is its due"; "the concept of fairness," which requires the court to "keep faith in these types of cases, with

those citizens who dutifully report their income and pay their taxes when due"; and "treatment of the rich and poor similarly." S.Tr. 39.

The District Court then turned to the facts and evidence affecting Mr. Warner's sentence. The court emphasized the seriousness of Mr. Warner's offense, recounting that he "hid a substantial amount of money from the government for a number of years and failed to report and pay taxes on the income earned from the hidden funds." S.Tr. 39. But the court also recognized that it must consider whether "a more complete picture of [Mr. Warner's] life justifies a more merciful notion of punishment and the opportunity to provide beneficial services to the community." S.Tr. 39.

To that end, the court discussed its consideration of the roughly 70 letters it received on Mr. Warner's behalf, which it noted were, "in many respects, quite different" from the kinds of letters the court has seen in the myriad other sentencing proceedings it has held. S.Tr. 40. The court explained that, in the typical case, letters are received only from "family members or close friends and often have a pro forma quality about them." S.Tr. 40. The letters submitted on Mr. Warner's behalf, by contrast, were much more detailed and "described knowledge and experiences which speak to Mr. Warner's personal qualities, which differ from those he manifested in committing the crimes he has admitted." S.Tr. 40.

To illustrate, and to provide insight into the reasoning behind its sentencing determination, the District Court read from several of these letters. Although many letters told of large financial contributions Mr. Warner has made to various charitable organizations and causes, what struck the court was what they revealed about Mr. Warner's character. For instance, the court read the entirety of Ms. Vasilakos' letter detailing how Mr. Warner "didn't have to return after" reading the flyer she gave him in the parking lot to help pay for her treatment but "chose to do so," and how his "generosity went further than simply donating." S.Tr. 41-42. The court emphasized a portion of a letter from the President of the Children's Hunger Fund explaining that, "[w]hile we have offered numerous times in the course of our relationship to publicize or promote Mr. Warner's generosity to CHF, in every instance he has humbly requested that no special efforts be made to publicly acknowledge his philanthropy." S.Tr. 46. The court read from letters recounting the exceptionally hands-on role Mr. Warner plays in designing Beanie Babies for charitable causes, S.Tr. 46-47, and the commitment he has shown to sharing the success of Ty Inc. with its employees through remarkably generous bonuses and employment terms, S.Tr. 47-48. The court observed that these and the dozens of "other letters not referenced describe a host of … actions, large and small, which reflect on Mr. Warner and are entitled to consideration in determining a just sentence for him." S.Tr. 48.

After the court again detailed the "salient facts" of Mr. Warner's offense, including the size of his foreign account, the years in which he failed to report it, and the $5.5 million tax loss that resulted, the court also reiterated that "the crime for which he stands convicted is a serious one." S.Tr. 50. The court also noted Mr. Warner's rejection from the voluntary disclosure program, his $53 million civil penalty, and his prompt payment of all penalties, back taxes, and interest in accordance with the plea agreement. The court then explained that, in its estimation, "[t]he hard question in this case is whether or not, given all the relevant circumstances of the crimes and of the defendant, himself, some period of incarceration should be imposed." S.Tr. 50.

The court ultimately concluded that it should not. The court first found it "obvious that specific deterrence is not necessary here" because "there is no question of [Mr. Warner] violating the tax laws in the future." S.Tr. 50. The court also found that significant general deterrence "has already been established" as a result of the "public humiliation and reproachment" that has resulted from the government's "highly-publicized prosecution" of Mr. Warner. S.Tr. 50. The court then discussed Mr. Warner's history and characteristics, explaining that the letters before it revealed that his "private acts of kindness, generosity and benevolence are overwhelming," "most done quietly and privately, and motivated by the purest of intentions." S.Tr. 50-51. The court concluded: "Never have I had a defendant in any case—white collar crime or

otherwise—demonstrate the level of humanity and concern for the welfare of others as has Mr. Warner." S.Tr. 50-51.

Weighing and balancing all these factors in this "difficult case," the court concluded that "society will be best-served by allowing [Mr. Warner] to continue his good works," "utilizing his talents and beneficence to help make this a better world," rather than by sending him to prison. S.Tr. 52-53. Accordingly, the court sentenced Mr. Warner to two years of probation, at least 500 hours of community service, a $100,000 criminal fine, $100 assessment, and $500 for the cost of prosecution—on top of the $53 million civil penalty that Mr. Warner already paid. S.Tr. 56-60. The court identified three schools for Mr. Warner's community service but emphasized that these three schools and the 500 hours are "a minimum," and that "[t]o the extent that it is prudent to offer more" time, the court would "expect that." S.Tr. 51.

## SUMMARY OF ARGUMENT

The sole question in this substantive reasonableness appeal is whether the District Court abused its considerable discretion in choosing to impose a sentence of probation rather than incarceration. That makes the government's burden a daunting one indeed. As this Court often has reiterated, the concept of substantive reasonableness contemplates a range, not a point, and that range must take into account the unique circumstances of each unique defendant. Precisely because District Courts possess an institutional

advantage in making the individualized and comparative assessments that sentencing requires, their sentencing decisions are entitled to substantial deference—whether or not they fall within the Sentencing Guidelines. That is all the more true in a case like this one, where, in keeping with its approach in similar cases, the government never even suggested that a Guidelines sentence would be appropriate.

The government dedicates much of its brief to recycling its sentencing arguments made in the District Court, but to prevail on appeal, it must do far more than convince this Court that a harsher sentence might have been appropriate. Instead, to establish that Mr. Warner's sentence is substantively unreasonable, the government must establish that *no* reasonable court could have concluded that the facts and circumstances at hand rendered a sentence of probation—the same type of sentence that has been imposed in the majority of offshore tax cases—sufficient, but not greater than necessary, in light of the factors that must guide a court's exercise of its ample sentencing discretion. The government has come nowhere close to satisfying that demanding standard.

At the outset, while the government quibbles around the edges, there can be no serious dispute that the District Court carefully considered all the parties' arguments and all the relevant factors before arriving at its sentence. Nor can there be any serious dispute that the District Court fully articulated

its reasons for selecting the sentence it did. As is clear, those reasons had nothing to do with rejection of the policy judgments reflected in the relevant statute or the Sentencing Guidelines, or any overarching views about the kinds of sentences that should be imposed on tax offenders or the wealthy. Instead, they were based exclusively on the District Court's assessment of the unique facts and circumstances of this case, and the remarkable personal qualities that Mr. Warner has exhibited throughout his life—in other words, on precisely the factors that Congress and the Supreme Court have instructed courts to consider when exercising their sentencing discretion.

Dissatisfied with the District Court's conclusion that the evidence before it did not warrant a sentence of incarceration, the government attempts to portray the court as having largely ignored the seriousness of the Mr. Warner's offense in favor of placing undue weight on a variety of purportedly impermissible factors. The court did no such thing. Contrary to the government's contentions, the court did not fixate on the size of Mr. Warner's charitable contributions. Instead, it appropriately focused on what Mr. Warner's extraordinary *acts* of kindness and generosity throughout his life demonstrate about the kind of person he is—*i.e.*, on his personal history and characteristics. Nor did the court suggest that Mr. Warner is entitled to special leniency because he was assessed and has the means to pay restitution and a massive civil penalty. To the contrary, the court explicitly agreed with the

government that, to the extent those payments are relevant to punishment and deterrence, they must be understood in relation to Mr. Warner's sizable net worth. And through all of this, the court never lost sight of the fact that Mr. Warner's offense was, in its own words, "a serious one."

The government alternatively accuses the District Court of creating unwarranted sentencing disparities. But that contention is considerably undermined by the reality that almost two-thirds of offshore tax offenders that the government has chosen to prosecute have received probation sentences (not to mention the fact that tens of thousands have avoided prosecution altogether through the voluntary disclosure program from which Mr. Warner was rejected). And it is even further undermined by the reality that the court's decision was based entirely on the unique characteristics of the defendant before it—characteristics that are unlikely to be exhibited by other offshore tax offenders, and thus unlikely to have much influence on sentencing determinations in future cases. Accordingly, nothing in the decision below would leave anyone with the impression that every tax offender is likely to receive the same sentence as Mr. Warner.

In short, this is not a case in which the District Court failed to address the relevant sentencing factors, or to take into consideration critical arguments, or to provide a reasoned explanation for the sentence it imposed. Instead, it is simply a case in which, after carefully considering all the

arguments and evidence put before it, the District Court disagreed with the government's assessment as to how to weigh the relevant sentencing factors. The District Court acted well within the bounds of its considerable sentencing discretion in doing so.

## ARGUMENT

**I.    District Courts Possess Extremely Broad Sentencing Discretion, And The Sentences They Impose May Be Held Substantively Unreasonable Only In The Narrowest Of Circumstances.**

The government challenges only the substantive reasonableness of the District Court's sentencing determination; it does not argue that the court committed procedural error.[3]  The government's burden therefore is a very demanding one.  In the nearly 10 years since the Supreme Court rendered the

---

[3] The government off-handedly suggests in a few footnotes that the District Court committed procedural error as well.  Setting aside the problem that points raised only in cursory footnotes generally are not preserved on appeal, *see, e.g.*, *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 924 (7th Cir. 2012), these arguments are nothing more than repackaged versions of the government's principal argument that the District Court abused its discretion in *weighing* the various sentencing factors.  *See, e.g.*, Govt.Br. 38 n.24 (faulting court for paying insufficient attention to government's sentencing disparities argument), 42 n.27 (faulting court for disagreeing with government's deterrence argument), 47 n.29 (faulting court for declining to adopt a definitive position on the effect of the IRS's voluntary disclosure program).  As the government ultimately concedes, the District Court addressed each of the sentencing factors and arguments its footnotes discuss.  *See* Govt.Br. 13-15 (recounting court's discussion of equality in sentencing, deterrence, and IRS's voluntary disclosure program).  The District Court's sentence thus is indisputably procedurally reasonable.  *See, e.g.*, *United States v. Wachowiak*, 496 F.3d 744 (7th Cir. 2007) (sentencing court need only "'set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority'" (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007))).

Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), this Court appears to have held only seven sentences substantively unreasonable—and two of those decisions are no longer good law.[4] Nationwide, over the past three years, Courts of Appeals have reversed barely 1% of challenged sentences as substantively unreasonable.[5]

Those statistics should come as little surprise given the exceedingly narrow scope of substantive reasonableness review. The Supreme Court has "made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions," both when the sentence is within the Guidelines range and when a District Court exercises its discretion to sentence outside the range. *Gall v. United States*, 552 U.S. 38, 46 (2007). Accordingly, when reviewing a sentence for substantive reasonableness, this Court "must give due deference to the district court's

---

[4] *United States v. Miller*, 601 F.3d 734 (7th Cir. 2010); *United States v. Bradley*, 628 F.3d 394 (7th Cir. 2010); *United States v. England*, 555 F.3d 616 (7th Cir. 2009); *United States v. Omole*, 523 F.3d 691 (7th Cir. 2008), *abrogated by Gall v. United States*, 552 U.S. 38 (2007), *as recognized by United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009); *United States v. Roberson*, 474 F.3d 432 (7th Cir. 2007); *United States v. Repking*, 467 F.3d 1091 (7th Cir. 2006); *United States v. Wallace*, 458 F.3d 606 (7th Cir. 2006), *vacated*, 552 U.S. 1088 (2008).

[5] *See* U.S. Sentencing Comm'n, *2011 Sourcebook of Federal Sentencing Statistics* Table 59 (2012), http://bit.ly/1rO9opX; U.S. Sentencing Comm'n, *2012 Sourcebook of Federal Sentencing Statistics* Table 59 (2013), http://bit.ly/VGtF3j; U.S. Sentencing Comm'n, *2013 Sourcebook of Federal Sentencing Statistics* Table 59 (2014), http://bit.ly/1oFflCc.

determination that the section 3553(a) factors, taken as a whole, justified the" sentence selected. *United States v. Carter*, 538 F.3d 784, 790 (7th Cir. 2008).

That deference is a necessary consequence of the principle, "uniform and constant in the federal judicial tradition," that "the sentencing judge [must] consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Because the District Court "sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record," *Gall*, 552 U.S. at 51, it is in a far better position than a reviewing court to make the kinds of individualized determinations that imposing a sentence requires. Moreover, the fact that District Courts "see so many more Guidelines cases than appellate courts do" provides them with an additional "institutional advantage over appellate courts in making these sorts of determinations." *Id.* at 52.

Precisely "[b]ecause the district court has greater familiarity with the case and the individual defendant and therefore an institutional advantage over an appellate court in making sentencing determinations," this Court "must defer, absent an abuse of discretion, to its ruling." *Carter*, 538 F.3d at 790. "The blending and evaluation of mitigating factors are matters best suited for, and so generally left to, the sentencing judge's discretion." *United States*

*v. Annoreno*, 713 F.3d 352, 360 (7th Cir. 2013).  Thus, generally speaking, this Court "will uphold [a] sentence so long as the district court offered an adequate statement of its reasons, consistent with 18 U.S.C. § 3553(a), for imposing" it. *United States v. Abebe*, 651 F.3d 653, 657 (7th Cir. 2011).  "The fact that [the appellate court] 'might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court.'" *Carter*, 538 F.3d at 790 (quoting *Gall*, 552 U.S. at 51).

In reviewing a sentence for substantive reasonableness, it is particularly "important to bear in mind that [t]he concept of substantive reasonableness contemplates a range, not a point." *Id.* at 790 (quotation marks omitted). Equally importantly, the Sentencing Guidelines in no way represent the outer limits of that range.  To the contrary, it is settled law that substantial departures from the Guidelines (including probation sentences) may not be treated as presumptively unreasonable on appeal. *See Gall*, 552 U.S. at 47, 51. That is all the more true in a case like this, where both the government and the defendant argued for sentences well below the Guidelines range.  And a reviewing court may not demand a showing of "extraordinary" circumstances whenever a court departs from the Guidelines range, or employ a "rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.*  Rather, even when reviewing the substantive reasonableness

of a sentence that falls outside the advisory Guidelines range, the Court must "defer to the sentencing court when the factors in 18 U.S.C. § 3553(a), when taken as a whole, justify the extent of the variance from the guidelines." *United States v. Lucas*, 670 F.3d 784, 796 (7th Cir. 2012) (quotation marks omitted).

In short, a substantive reasonableness appeal is not a second bite at the proverbial apple, in which the appellant may re-litigate all the issues the District Court considered and resolved. Nor is it an opportunity to present additional arguments or evidence that the District Court was never even asked to consider, as it is axiomatic that "[a]ppellate review must be based on the record before" the court below. *Rodriguez v. Anderson*, 973 F.2d 550, 554 (7th Cir. 1992). Instead, this Court's "task on reasonableness review is limited" to considering "the sentencing court's explanation of its reasons for imposing a particular sentence," based on the facts and arguments presented to it. *Carter*, 538 F.3d at 789. The Court's "authority is simply to determine if the sentence is legal and, in the circumstances of the case, reasonable in light of the statutory mandate contained in 18 U.S.C. § 3553(a)." *Id.* at 797. Only in the rare instance when the District Court's "articulated reasons" are insufficient to "assure … that the sentencing process was a reasoned one" may this Court hold that the District Court exceeded the bounds of its considerable sentencing discretion. *Id.*

## II.    Mr. Warner's Sentence Is Substantively Reasonable.

The District Court acted well within its very broad discretion in sentencing Mr. Warner to two years of probation and at least 500 hours of community service.  The government cannot and does not dispute that the District Court fully considered all the section 3553(a) factors and provided a detailed explanation as to how it arrived at the sentence it imposed.  Instead, the government recycles its arguments from the sentencing proceedings in the District Court and quarrels only with the manner in which that court weighed and balanced the relevant sentencing factors.  In effect, the government's position boils down to a contention that *no* reasonable sentencing court could have concluded that the unique facts of this case rendered a sentence of probation sufficient to serve the section 3553(a) factors.  The government has come nowhere close to meeting its burden of establishing that extraordinary proposition.

### A.    The District Court Expressly and Appropriately Considered the Relevant Sentencing Factors.

As the factors set forth in 18 U.S.C. § 3553(a) make clear, sentencing decisions are inherently individualized and discretionary determinations. When determining what sentence is "sufficient, but not greater than necessary, to comply with the purposes" that sentences should achieve, a court must consider such factors as "the nature and circumstances of the ... history and

characteristics of the defendant"; "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant…"; "the kinds of sentences available"; the kinds and range of sentences established by the guidelines; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

There can be no serious dispute that the District Court carefully considered all these factors before arriving at its sentence. The court began by emphasizing that is it "fundamental to any system of criminal justice" that each sentencing determination must take into account "the dignity of the law and respect which is its due," must "keep faith … with those citizens who dutifully report their income and pay their taxes when due," and must ensure "treatment of the rich and poor similarly." S.Tr. 39. The court repeatedly recognized that "the crime for which [Mr. Warner] stands convicted is a serious one." S.Tr. 50; *see also* S.Tr. 38. The court reiterated that Mr. Warner "hid a substantial amount of money from the government for a number of years and failed to report and pay taxes on the income earned from the hidden funds." S.Tr. 39. And, consistent with the government's sentencing arguments, the court paid particular attention to the considerable size of the account and tax

loss at issue, noting that Mr. Warner "had undisclosed Swiss bank accounts that, at their peek [sic], exceeded $100 million," and "failed to pay taxes of approximately $5 million on that omitted income in the years 1999 to 2007." S.Tr. 48-49.

At the same time, the court recognized its obligation under section 3553(a) to consider whether "a more complete picture of [a defendant's] life justifies a more merciful notion of punishment and the opportunity to provide beneficial services to the community." S.Tr. 39; *see* 18 U.S.C. § 3553(a)(1), (3) ("[T]he court … shall consider … the history and characteristics of the defendant" and "the kinds of sentences available."). Accordingly, the court paid careful attention to the several unusually detailed letters it received "describ[ing] knowledge and experiences which speak to Mr. Warner's personal qualities." S.Tr. 40. As the court explained, these letters recounted "overwhelming" "private acts of kindness, generosity, and benevolence," S.Tr. 50, and demonstrated that Mr. Warner has done "things that [the court is] not aware anyone else does." S.Tr. 52. The court was so struck by the personal characteristics of Mr. Warner revealed in these letters that it made the remarkable observation: "Never have I had a defendant in any case—white collar crime or otherwise—demonstrate the level of humanity and concern for the welfare of others as has Mr. Warner." S.Tr. 50-51.

Nonetheless, the court did not allow that conclusion to blind it to its duty to consider the other factors Congress has enumerated to guide sentencing determinations. To the contrary, the court carefully considered and explained, *inter alia*, its findings that no specific deterrence was necessary in the case, S.Tr. 50; that much general deterrence already had been achieved as a result of Mr. Warner's highly-publicized prosecution, S.Tr. 50; that Mr. Warner "has been punished ... severely" by, among other things, the unprecedented $53 million civil fine, which vastly exceeded the actual tax loss, S.Tr. 53; and its recognition of "the variety of comparisons made by both sides to other people who have been engaged in conduct at least somewhat similar to Mr. Warner's," S.Tr. 38.

In the end, the court acknowledged that this was a "difficult case," S.Tr. 52, in which several of the sentencing "factors run in different directions," S.Tr. 38. Only after taking all those factors into consideration did the court conclude that "society will be best-served by allowing [Mr. Warner] to continue his good works" while serving a probation and community service sentence rather than sending him to prison. S.Tr. 52-53.

As the ample record the court created confirms, its "articulated reasons" for reaching that conclusion are more than sufficient to "assure [this Court] that the sentencing process was a reasoned one," and that the sentence imposed is both "legal and, in the circumstances of the case, reasonable in light

of the statutory mandate contained in 18 U.S.C. § 3553(a)." *Carter*, 538 F.3d at 797. While the sentence is below the Guidelines range, it is well within the heartland of sentences that have been imposed in analogous cases. *See infra* Part II.C. And the District Court was quite careful to articulate why, in its view, that sentence was warranted by the unique facts of this case and characteristics of this defendant, rather than by any disagreement with the policy statements articulated in the Guidelines or overarching judgments about the kinds of sentences warranted in offshore tax cases. *See Peugh v. United States*, 133 S. Ct. 2072, 2080 (2013) ("'[A] district court's decision to vary from the advisory Guidelines may attract greatest respect when' it is based on the particular facts of a case." (quoting *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)). In short, relying on "reasons that are logical and consistent with the § 3553(a) factors," the court imposed a sentence that "falls within the broad range of reasonable sentences in the circumstances of the case." *Wachowiak*, 496 F.3d at 754 (quotation marks omitted).

**B.     The District Court Neither Considered Impermissible Factors Nor Placed Impermissible Weight on Any Factors It Considered.**

The government attempts to paint a very different picture, insisting that the District Court largely ignored all its arguments about the seriousness of Mr. Warner's offense in favor of giving "extraordinary and undue weight to defendant's charitable contributions" and other factors that the government

considers insufficient to justify a probation sentence. Govt.Br. 23. That characterization of the proceedings below is neither accurate nor fair. As this Court has emphasized, "context and record are crucial to rendering an accurate analysis of the district court's consideration of the arguments" presented at sentencing. *United States v. Marin-Castano*, 688 F.3d 899, 903 (7th Cir. 2012). When the sentencing transcript is considered as a whole, it is clear that the government's contentions have no merit whatsoever.

1. Contrary to the government's suggestions, the District Court did not fixate on the size of Mr. Warner's financial contributions to charity. Instead, the court gave great weight to what Mr. Warner's "overwhelming" "*acts* of kindness, generosity and benevolence"—acts both "large and small," and of a kind that the court had never before seen in its decades of sentencing experience—revealed about Mr. Warner's *character*. S.Tr. 48, 50 (emphasis added). That is precisely the type of evidence that a court is supposed to take into account when making the inherently individualized determination that sentencing requires. *See* 18 U.S.C. § 3553(a)(1) (courts must consider "the history and characteristics of the defendant").

For instance, the court focused on Ms. Vasilakos' letter explaining how Mr. Warner's "generosity went further that simply donating," as he "provided the network to get [her] story out there," "to help raise awareness about" her condition and potential treatments, and ultimately to help "alter[] the path of

research and help[] others learn about stem cell treatment." S.Tr. 42. The government quibbles that this episode occurred after Mr. Warner knew he was under investigation, Govt.Br. 31 n.18, but the letters on which the District Court relied detail comparable incidents of extraordinary efforts to aid individuals with serious medical problems throughout Mr. Warner's life. *See, e.g.*, App. 28-29.

In reading from a letter from the President of the Children's Hunger Fund, the court acknowledged the considerable size of Mr. Warner's charitable contributions, but placed more emphasis on the portion of the letter that explained how Mr. Warner repeatedly declined all attempts "to publicize or promote [his] generosity." S.Tr. 46. Likewise, in reading from the letter relating to Mr. Warner's actions on behalf of the Princess Diana Memorial Fund, the court highlighted not simply the financial benefit the fund received, but the "tremendous attention to detail and work ethic" Mr. Warner personally displayed in creating the specialized Beanie Baby. S.Tr. 46.

The court also noted actions that had nothing to do with charitable contributions. For example, the court took note of Mr. Warner's generous attitude toward his employees, sharing the profits of Ty Inc. from its earliest days of success by giving bonuses equal to each employee's annual salary, and consistently maintaining commission rates that allowed his sales force to earn exceptional returns on their contributions to the company's success. S.Tr. 47-

48. Again the government quibbles that Mr. Warner's business benefitted from these actions, Govt.Br. 29, but that is both beside the point and hardly a basis for overturning a sentence as substantively unreasonable. As the court explained, the letters it received were not just about checks that Mr. Warner has written; instead, they detailed "a host of … *actions*, large and small, which reflect on Mr. Warner" and the kind of person he is. S.Tr. 48 (emphasis added). There was nothing remotely inappropriate about the court's decision to consider "the level of humanity and concern for the welfare of others," S.Tr. 50-51, that Mr. Warner has demonstrated throughout his life when determining what kind of sentence would be "sufficient, but not greater than necessary" to accomplish the goals set forth in section 3553(a).

The cases upon which the government relies do not suggest otherwise. As the government acknowledges in a footnote, *see* Govt.Br. 24 n.10, its principal authority does not even involve a substantive reasonableness challenge and thus was not decided under the highly deferential abuse-of-discretion standard. *See United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010). Instead, *Vrdolyak* held only that the District Court committed *procedural* error by "fail[ing] to discuss any of the evidence that showed the defendant's character in a bad light" and "giv[ing] no weight to the fact that the defendant is … wealthy" while giving "enormous weight" to letters discussing various "gifts of money" that the defendant had made. *Id.* at 682.

The District Court made no comparable errors here. The government does not and cannot identify any "bad acts" by Mr. Warner other than the offense in question, which the District Court explained in detail and readily acknowledged was "a serious one." S.Tr. 50.

The government now suggests that the value of the letters submitted on Mr. Warner's behalf was diminished both by their sources and by the timing of some of the actions they discussed. *See* Govt.Br. 31. Those would be perfectly fair arguments in a sentencing proceeding, but they are not a remotely sufficient basis to overturn a sentence as substantively unreasonable. Indeed, in the District Court, the government openly acknowledged that Mr. Warner "should be commended for his charity"; its only quarrel was with the weight that those actions should be given in selecting a sentence. App. 83; *see also* S.Tr. 16 ("[T]here is no dispute that he has certainly helped people along the way."). In any event, although the government did not even bother to raise these arguments below, the District Court did carefully note the relationship to Mr. Warner of the author of every letter from which it read and saw no reason to question the value of those letters on account of those relationships. To the contrary, the court made an explicit finding that Mr. Warner's actions were "motivated by the purest of intentions" and "done without a view toward using [them] at sentencing." S.Tr. 38, 51. That kind of credibility determination is a quintessential sentencing court judgment.

The government also faults the District Court for purportedly "failing to discuss or evaluate the defendant's charitable contributions in relation to his wealth." Govt.Br. 27. First of all, the government's characterization of what "this Court's precedent instructs" in this regard, *id.*, is considerably overstated. The *Vrdolyak* Court was careful to note that it was "not laying down rules of sentencing," that "[t]he sentencing discretion of federal judges is broad," and that its "concern [wa]s not with the judge's having taken account of the defendant's good works but with his failure to consider the full range of evidence pertinent to a just sentence." *Vrdolyak*, 593 F.3d at 583. And the court specifically emphasized that its review is even more "deferential" when, as here, "the issue is the substantive reasonableness rather than the procedural regularity of the sentencing determination." *Id.* Accordingly, nothing in *Vrdolyak* grafts onto section 3553(a) an implicit requirement to engage in a side-by-side comparison of a defendant's net worth and his charitable contributions.

Moreover, once again, this is a point on which the government offered the District Court very little in the way of argument. *See* App. 83 (noting only that "given his means, defendant's charitable works are hardly exceptional"); S.Tr. 16 (arguing only that "the defendant's good acts do not change the fact that he simply did not pay his fair share of taxes"). That should come as little surprise, as the government's insistence on focusing on the *relative* value of

Mr. Warner's charitable contributions—which by any measure involve enormous amounts of money—is in considerable tension with its insistence on focusing on the *absolute* value of Mr. Warner's offshore account and tax loss when it comes to evaluating the seriousness of the offense. The government cannot have it both ways.[6]

In any event, once again, the government misses the point of the District Court's findings, which focused not just on the size of Mr. Warner's financial contributions, but on the nature of the actions in which Mr. Warner engaged and what those actions revealed about his character. That is clear from the court's repeated focus on such factors as his "services and kindness to mankind" and the ways in which he has "utiliz[ed] his talents and beneficence to help make this a better world." S.Tr. 38, 51; *see also id.* at 51 (stressing Mr. Warner's "level of humanity and concern for the welfare of others"); *id.* 52 ("[H]e did things that I am not aware anyone else does."). In short, to the

---

[6] The government faults the District Court for failing to address the proper method for valuing the Beanie Babies that Mr. Warner donated to various charitable causes. *See* Govt.Br. 26-27. As the government raised this point only in a footnote in its sentencing memorandum, App. 83 n.16, and never even mentioned it at the sentencing hearing, S.Tr. 16, the District Court hardly abused its discretion by declining to treat the issue as central to its sentencing determination. "[E]ven when arguments … are supported factually, judges need not tick off every possible sentencing factor or detail and discuss, separately, every nuance of every argument." *United States v. Chapman*, 694 F.3d 908, 914 (7th Cir. 2012) (quotation marks omitted). In all events, precisely because the District Court focused on the character of Mr. Warner's charitable actions, not the dollar value of his contributions, the government's belated effort to discount them to reflect the cost of goods sold, rather than fair market value, is entirely beside the point.

extent the District Court did not engage in the kind of amateur accounting the government seems to envision, that is because, unlike the government, the court was not fixated on the dollar amounts before it. Instead, it correctly recognized its duty to consider all of "the history and characteristics of the defendant" when determining what sentence to impose. 18 U.S.C. § 3553(a)(1).

The government's reliance on *United States v. Repking*, 467 F.3d 1091 (7th Cir. 2006), is equally misplaced. As an initial matter, *Repking* was decided before the Supreme Court's decision *Gall* and invoked exactly the kind of rigid "exceptional circumstances" rubric that *Gall* rejected. *Compare id.* at 1095 ("charitable works must be exceptional before they will support a more-lenient sentence") *with Gall*, 552 U.S. at 47 ("We reject … an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range."). Accordingly, the "exceptional circumstances" rule it invokes is of questionable value after *Gall*.

Of course, here, the District Court *did* find that Mr. Warner's charitable actions were "extraordinary." After considering his "overwhelming" "private acts of kindness, generosity, and benevolence," including both "large and small" acts, financial and non-financial acts, the court concluded: "Never have I had a defendant in any case—white collar crime or otherwise—demonstrate the level of humanity and concern for the welfare of others as has Mr. Warner." S.Tr. 48, 50-51. That statement is remarkable enough in its own right, but

even more so coming from a 34-year veteran of the bench.  It also makes this case a far cry from *Repking*, in which the District Court noted only that the defendant, who used his position as a bank president to "st[eal] for himself and his friends," "had done unspecified 'good works'" and made charitable contributions that were "entirely consistent with a bank's business development plan." *Repking*, 467 F.3d at 1093, 1096.

2. The government fares no better with its contention that the District Court placed undue weight on Mr. Warner's satisfaction of his restitution and civil penalty or the public humiliation that his prosecution and conviction has caused him.  Govt.Br. 32-39.  Once again, the government's arguments largely ignore the "context" that is "crucial to rendering an accurate analysis of the district court's consideration of the arguments." *Marin-Castano*, 688 F.3d at 903; *see also id.* ("[I]t is easy to overlook context by simply extracting quotations and considering them in isolation.").

Although the government has much to say about the dangers of placing undue weight on a wealthy defendant's ability to pay restitution, *see* Govt.Br. 32-37, it has noticeably little to say about the purportedly "great emphasis" the District Court placed on this factor, Govt.Br. 32.  Indeed, in its entire discussion of restitution and civil penalties, the government identifies only two statements by the District Court having anything to do with either.  *See* Govt.Br. 36-37.  One of those is when, after noting the unprecedented $53

42

million civil fine that Mr. Warner paid as part of his plea agreement, the District Court explicitly *credited* the very argument the government repeats on appeal: "And the other argument the government makes—*and properly so*—if we measure his wealth, it is a small percentage." S.Tr. 53 (emphasis added). The court then followed that up by noting, "that is one way of looking at it, but it is also a lot of money for the government to defray whatever the expenses of running the government are." S.Tr. 53. And that is the sum total of the District Court's discussion of how to weigh Mr. Warner's payment of restitution and a civil fine.

Particularly when placed in the context of the District Court's 15-page explanation of the basis for it sentencing determination, that hardly amounts to "great emphasis"—let alone *unduly* great emphasis—on the financial components of Mr. Warner's plea agreement. Nor does it reflect an attempt to "reward" Mr. Warner for satisfying those financial obligations, or convert them into "a get-out-of-jail card." Govt.Br. 33, 37. To the contrary, the District Court's statements simply reflect its recognition that Mr. Warner did in fact pay a $53 million civil penalty, and did in fact pay "more than he ever would have paid had he filed the returns and included all of the income." S.Tr. 53.

That readily distinguishes this case from *United States v. Engle*, 592 F.3d 495 (4th Cir. 2010), on which the government relies. There, the court held that a sentence must be reversed for *procedural* error after finding the record

"insufficient to permit meaningful appellate review." *Id.* at 504. Nonetheless, the court went on to opine in dicta that the sentence also was substantively unreasonable in light of the District Court's "near-exclusive focus on Engle's financial ability to pay restitution," which it had "made … clear" was the but-for reason for its non-Guidelines sentence. *Id.* Here, by contrast, there was neither procedural error nor a focus—"near-exclusive" or otherwise—on what effect a sentence of imprisonment would have on Mr. Warner's ability to "generate the income" to pay restitution. *Id.* Instead, the District Court's brief discussion of restitution and the $53 million civil penalty was just part and parcel of its assessment of punishment and deterrence. The government concedes that deterrence is a relevant factor, and it would blink reality to ignore the effect that the payment of a civil penalty near ten times the total tax loss has on deterrence, both specific and general.

The same is true of the District Court's reference to the "humiliation and reproachment Mr. Warner has experienced" as a result of his prosecution and conviction. S.Tr. 50. The court did not identify these factors as "part of [Mr. Warner's] punishment" or as particularly important aspects of its decision to impose a probation sentence. Govt.Br. 38. Instead, the court merely noted, in a single reference, that the particularly "highly-publicized" nature of this prosecution was relevant to evaluating the extent to which the government "ha[d] already … established" some measure of "general deterrence," S.Tr. 50,

which is an indisputably relevant sentencing factor. Thus, here too the government "overlook[s] context by simply extracting quotations and considering them in isolation." *Marin-Castano*, 688 F.3d at 903. This case is simply nothing like the out-of-circuit cases it invokes. *See United States v. Bistline*, 665 F.3d 758, 765 (6th Cir. 2012) (vacating where court identified public nature of sex offender registration as a reason to sentence defendant who knowingly possessed hundreds of images of child pornography to one night in lock-up); *United States v. Peppel*, 707 F.3d 627, 635 (6th Cir. 2013) (vacating where court "never explained why the seven-day sentence was sufficient to reflect the seriousness of [the defendant's] crimes").

Indeed, if any case in instructive here, it is the Supreme Court's decision in *Gall*. There, the defendant was a prior drug user and participant in an ecstasy distribution ring. 552 U.S. at 41. Although he eventually withdrew from the conspiracy, he did not come forward to authorities. A few years later, when "approached by federal law enforcement agents," he "admitted his limited participation in the distribution of ecstasy." *Id.* at 42. A year and a half later, he was indicted for his participation in the conspiracy and ultimately pled guilty. Although his Guidelines range was 30 to 37 month in prison, the District Court imposed a sentence of three years of probation—a sentence that was reversed on appeal, only to be reinstated by the Supreme Court.

In arriving at that sentence, the District Court emphasized a number of factors that bear a striking similarity to the factors the District Court emphasized in this case. For instance, the record included "a 'small flood' of letters from Gall's parents and other relatives, his fiancée, neighbors, and representatives of firms doing business with him, uniformly praising his character and work ethic." *Id.* at 43; *compare* S.Tr. 40-50. It demonstrated that, since his withdrawal from the drug conspiracy, Gall had lived a "law-abiding life," obtained a college degree, started his own business, and supported his family and friends. 552 U.S. at 43-44. The court specifically found that this good conduct "was not motivated by a desire to please the Court or any other governmental agency, but was the pre-Indictment product of the Defendant's own desire to lead a better life." *Id.*; *compare* S.Tr. 38 (Mr. Warner's "services and kindness" were "done without a view toward using it at sentencing").

Based on these factors, the District Court determined that three years of probation "was sufficient, but not greater than necessary to serve the purposes of sentencing." 552 U.S. at 44. "Any term of imprisonment," the court explained, "would be counter effective by depriving society of the contributions of the Defendant who … understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." *Id.*; *compare* S.Tr. 52-53 ("[S]ociety will be best-served by allowing [Mr. Warner] to continue his good

works.").  At the same time, the court "reminded Gall that probation, rather than 'an act of leniency,' is a 'substantial restriction of freedom'" and emphasized the specific restrictions imposed under the sentence.  552 U.S. at 44; *compare* S.Tr. 51-52.

Although the government and the appellate court were of the view that a probation sentence failed to reflect the seriousness of Gall's offense, the Supreme Court disagreed.  In doing so, the Court reproached the Court of Appeals for having given "virtually no deference to the District Court's decision that the § 3553(a) factors justified a significant variance" when all the relevant facts were taken into consideration.  552 U.S. at 56.  The Court concluded that the District Court "quite reasonably attached great weight" to Gall's efforts "to change his life," which "len[t] strong support to the District Court's conclusion that Gall [wa]s not going to return to criminal behavior and [wa]s not a danger to society," *id.* at 57, and thus also to its conclusion that a probation sentence was "sufficient, but not greater than necessary" to accomplish Congress' sentencing objectives, 18 U.S.C. § 3553(a).

The same is true here. Just as in *Gall*, the District Court concluded that Mr. Warner's good conduct was genuine and unrelated to any desire for leniency.  And the 70-plus personalized letters submitted on Mr. Warner's behalf tell the story of a man who has overcome significant personal obstacles and has dedicated himself to helping others do the same.  Indeed, aside from

the isolated mistake that resulted in his conviction, Mr. Warner's entire life has been built on hard work and concern for others. The District Court acted well within its discretion in concluding that these unique personal characteristics rendered a probation sentence both reasonable and appropriate. The government's continued insistence otherwise runs headlong into *Gall*'s admonition that "it is not for the Court of Appeals to decide *de novo* whether the justification for a variance is sufficient or the sentence is reasonable." 552 U.S. at 59.

### C. Mr. Warner's Sentence Is Consistent with Analogous Cases and Does Not Cause Unwarranted Sentencing Disparities.

The government alternatively contends that the District Court's decision to impose a sentence of probation rather than incarceration has created unwarranted sentencing disparities. Govt.Br. 46. Not so. In fact, if anything, consideration of how the courts, the Department of Justice, and the IRS have treated similarly situated defendants only underscores the reasonableness of the District Court's decision to impose a probation sentence in this case.

As Mr. Warner explained before the District Court, this case is part of an aggressive five-year government program to pursue tax offenders who have used offshore accounts to conceal funds. More than 100 individuals have been charged as a part of that program, and approximately half of them have been sentenced to date. Unsurprisingly, the government has pursued mostly cases

involving significant tax loss and large foreign accounts, including one as high as $200 million. By far, the most common sentence in these cases has been probation. Indeed, the statistics Mr. Warner presented demonstrate that more than 60% of these individuals received probation sentences, including some of the very few who, like Mr. Warner, attempted to enter the government's voluntary disclosure program but were rejected. *See* App. 61.

To take one example that both parties highlighted before the District Court, Mary Estelle Curran was sentenced to *five seconds* of probation for failure to disclose a Swiss bank account of over $47 million. Tr. of Sentencing Hearing 17, *United States v. Curran*, No. 12-CR-80206 (S.D. Fla. Apr. 25, 2013). There, the District Court placed great weight on the fact that Ms. Curran's conduct was virtually identical to those accepted into the voluntary disclosure program. *Id.* at 13-14. Moreover, like Mr. Warner, Mr. Curran already had paid a 50% civil penalty before sentencing. *Id.* at 6. Paul Zabczuk funneled payments from foreign clients and other funds through offshore accounts he controlled in the Bahamas and Switzerland. Like Mr. Warner, he attempted to enter the voluntary disclosure program but was rejected. He was sentenced to three years of probation, 12 months of home detention, and 150 hours of community service. Judgment, *United States v. Zabczuk*, No. 10-CR-60112 (S.D. Fla. July 27, 2010). Others who sought to enter the off-shore

voluntary disclosure initiative but were rejected received probation sentences or less than six months in prison.  App. 61.

Defendants who chose not to try to enter the voluntary disclosure program have received probation sentences as well.  For example, Juergen Homann, who controlled a UBS account of $5 million and never attempted to enter the program, was sentenced to five years of probation and 300 hours of community service.  Judgment, *United States v. Homann*, No. 09-CR-724 (D.N.J. Jan. 6, 2010).  Steven Rubinstein, who hid approximately $7 million in undisclosed UBS accounts used to purchase real estate and South African Kruggerands, was sentenced to three years of probation and 12 months of home detention.  Judgment, *United States v. Rubinstein*, No. 09-CR-60166 (S.D. Fla. Oct. 28, 2009). Andrew Silva, who repatriated funds from his undisclosed offshore account by mailing himself 26 packages of currency and carrying another two packages into the United States, always structured in amounts under $10,000, received two years of probation, four months of home detention, and 100 hours of community service.  Judgment, *United States v. Silva*, No. 10-CR-44 (E.D. Va. June 11, 2010).

Notwithstanding the government's attempt to portray Mr. Warner as "the worst of the worst," many of the defendants who have received probation in these cases are quite similarly situated to Mr. Warner.  For instance, Igor Olenicoff controlled and hid assets in undisclosed foreign accounts containing

approximately $200 million, and his tax liability to the IRS totaled $52 million. Like Mr. Warner, he was sentenced to two years of probation. Judgment & Commitment, *United States v. Olenicoff*, No. 07-CR-227 (C.D. Cal. Apr. 16, 2008). Jules Robbins, who created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts containing nearly $42 million, was sentenced to 12 months of probation. Judgment, *United States v. Robbins*, No. 10-CR-333 (S.D.N.Y. Oct. 8, 2010). Ernest Vogliano, who opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations and actively used the funds, even transferring some after learning of the criminal investigation, was sentenced to two years' of probation. Judgment, *United States v. Vogliano*, No. 10-CR-327 (S.D.N.Y. Apr. 26, 2011).[7]

Finally, one can hardly ignore the reality that the government has chosen to allow tens of thousands of individuals who committed the same crime

---

[7] The government vaguely suggests that the extensive list of analogous cases Mr. Warner presented to the District Court "omitted a number of defendants sentenced to incarceration." Govt.Br. 50. In fact, the government's sentencing memorandum identified only three such cases, none of which was anything like this one. *See* App. 97 n.26 (citing *United States v. Alan*, No. 10-CR-160 (W.D. Pa.); *United States v. Ferdig*, No. 09-CR-348 (C.D. Cal.); *United States v. Assor, et al.*, No. 10-CR-60159 (S.D. Fla.)). The defendant in *Alan* was a tax protester who did anything and everything he could to avoid paying taxes, including lying to IRS agents during their investigation; the defendants in *Assor* falsified bank documents, stole identities, and perpetrated a fraud on a state court; and the defendant in *Ferdig* was accused of running a Ponzi scheme. Unsurprisingly, the government has not attempted to draw any actual comparisons to those cases. And of course the fact remains that well over half of the reported offshore prosecutions have resulted in probation.

as Mr. Warner to avoid prosecution entirely through its voluntary disclosure programs.[8]  To be sure, the government enjoys broad prosecutorial discretion and is under no obligation to prosecute all law-breakers.  But when it opts to grant blanket immunity to a whole class of law-breakers, it can hardly complain when District Courts conclude that criminal sentences of probation, community service, and considerable fines are sufficient to punish and deter those who are prosecuted for the same crime.  Indeed, if the government has the discretion to categorically exempt tens of thousands of tax evaders from criminal prosecution entirely, it is hard to see how a court lacks the discretion to conclude that the kinds of unique mitigating factors present here—including a *$53 million* civil penalty, which is more than twice what Mr. Warner could have faced under the voluntary disclosure program—render a probation sentence appropriate.  *Cf. United States v. Reyes-Hernandez*, 624 F.3d 405,

---

[8] Although the government speculates that Mr. Warner came forward only because he realized he was likely to be prosecuted, it conceded below that there is "no evidence that [Mr. Warner] knew he was under criminal investigation at the time of disclosure."  App. 85.  Moreover, this particular disclosure program was announced in conjunction with the government's indication that it was taking unprecedented efforts to target accounts in Switzerland.  Thus, those who participated in the program did so with full knowledge that the government was taking unprecedented efforts to challenge the secrecy that traditionally shrouded Swiss bank accounts.  In fact, even individuals who received a letter from their Swiss bank specifically warning that records would be produced to the United States government in the future were not precluded from entering into the program.  In those circumstances, the difference between someone who knew about the government's broader efforts—or had actual knowledge of an impending disclosure by his or her bank to the government—and someone like Mr. Warner, who received no such letter and had no knowledge that he was under investigation, is a fine line indeed.

409-10 (7th Cir. 2010) (permitting courts to account for sentencing disparities that resulted from another district's "fast track" plea bargaining systems, which often result in lower sentences).

Although the government nit-picked these comparisons in the District Court and does so again before this Court, all of these examples considerably undermine its contention that "[t]he best way to avoid unwarranted sentencing disparities … is to sentence within the advisory Guidelines range."  Govt.Br. 47-48.  In fact, the government itself did not request a within-Guidelines sentence in this case.  Instead, it generically requested a period of incarceration of more than one year and one day—which would have been one of the longest sentences imposed in an offshore tax case.  As that request reflects, even the government recognizes that the Guidelines do not provide a complete or accurate picture of sentencing practices in offshore tax cases, which routinely produce probation sentences comparable to the one imposed here.

Indeed, even now, the government's contention is not that Mr. Warner's *sentence* is an outlier, but rather that Mr. Warner is an outlier *offender*, and thus should be given a harsher sentence than other offenders.  *See* Govt.Br. 49.  The government is certainly entitled to that view, which it made known to the District Court, both in its sentencing memorandum and at the sentencing hearing.  *See* App. 93-99; S.Tr. 17-20.  But the District Court was just as entitled to disagree with the government's recommendation as to how best to

weigh the seriousness of Mr. Warner's offense against the many other factors that must guide its sentencing determination, and the wealth of evidence that Mr. Warner provided to support his contrary recommendation. As this Court has reminded repeatedly, "blending and evaluation of mitigating factors are matters best suited for, and so generally left to, the sentencing judge's discretion." *Annoreno*, 713 F.3d at 360.

For largely the same reasons, the government's fear that affirming Mr. Warner's probation sentence will reduce incentives to cooperate or skew future courts' ability to choose a proper sentence for future defendants is unfounded.[9] At the outset, the government's dismissive treatment of probation sentences is in considerable conflict with myriad decisions reiterating that probation is a meaningful penalty. As the Supreme Court has emphasized, defendants sentenced to probation are "subject to several standard conditions that substantially restrict their liberty." *Gall*, 552 U.S. at 48. "Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to

---

[9] Of course, Mr. Warner *did* attempt to cooperate with the government when he applied for the voluntary disclosure program, but he was rejected. If anything, therefore, it is the government's desire to spring a record-setting prison sentence— on top of a record-setting civil penalty—on someone who tried to come clean that could discourage offenders to come forward and voluntarily disclose their crimes. Mr. Warner also pledged, as part of his plea agreement, to provide continuing cooperation with the U.S. Attorney's Office and the IRS, including by providing any requested financial statement or related records. Mr. Warner has lived up to that pledge.

which every citizen is entitled.'" *United States v. Knights*, 534 U.S. 112, 119 (2001) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). This Court, too, has recognized that probationers "remain subject to substantial controls." *Green v. Berge*, 354 F.3d 675, 680 (7th Cir. 2004) (Easterbrook, J., concurring). "And it has long been understood that a fundamental and unchallenged condition of probation is that the probationer surrender his right to trial by jury should the government seek revocation, and thus imprisonment." *United States v. Cranley*, 350 F.3d 617, 621 (7th Cir. 2003).

In any event, the government's concerns about the implications of this case on other cases are substantially diminished by the District Court's repeated and emphatic statements that its sentence was based on Mr. Warner's "very unique" personal history and characteristics, S.Tr. 38, not some broader policy judgment regarding the seriousness of offshore account crimes. Again, the court emphasized that Mr. Warner's crime was "a serious one," and concluded that a sentence of probation was appropriate only because Mr. Warner "demonstrate[d] [a] level of humanity and concern for the welfare of others" that the court had never before seen. S.Tr. 50-51. Surely future courts can and will take account of the unusual facts of this case when sentencing future defendants who are unable to demonstrate the same superlative kindness, generosity, beneficence, acceptance of responsibility, and unqualified remorse that Mr. Warner has demonstrated. After all, a sentencing

determination must take into account both "the need to avoid unwarranted disparities" among similar offenders and "the need to avoid unwarranted *similarities*" among defendants who are "not similarly situated." *Gall*, 552 U.S. at 55.

*   *   *

At bottom, the government asks this Court to re-evaluate largely the same evidence and arguments that the District Court considered and rejected in arriving at its sentence. But substantive reasonableness review is not a do-over. It is simply a highly deferential review of whether the District Court acted within the bounds of its considerable sentencing discretion. The District Court plainly did so here. The court imposed a sentence that is well within the range that has emerged from dozens of comparable cases, and it carefully articulated its reasons for concluding that this sentence was warranted by the "very unique" facts of this case. S.Tr. 38. Contrary to the government's contentions, the court did not convert Mr. Warner's sizable charitable donations or massive civil penalty into a "get-out-of-jail-free card." Instead, it focused on Mr. Warner's *actions*, and what those actions say about the kind of person he is. In other words, the court appropriately focused on precisely the kinds of individualized facts and characteristics on which a court is supposed to focus when imposing a sentence. In short, relying on "reasons that are logical and consistent with the § 3553(a) factors," the court imposed a sentence

that "falls within the broad range of reasonable sentences in the circumstances of the case." *Wachowiak*, 496 F.3d at 754 (quotation marks omitted). This Court's precedents require nothing more.

## CONCLUSION

For the reasons set forth above, this Court should affirm the District Court's sentencing decision.

Respectfully submitted,

GREGORY J. SCANDAGLIA
MICHAEL S. SHAPIRO
SCANDAGLIA & RYAN
55 East Monroe Street
Suite 3440
Chicago, IL 60603
(313) 580-2020

MARK E. MATTHEWS
CAPLIN & DRYSDALE CHTD.
One Thomas Circle NW
Suite 1100
Washington, DC 20005
(202) 862-5000

s/PAUL D. CLEMENT
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
BANCROFT PLLC
1919 M Street NW
Suite 470
Washington, DC 20036
(202) 234-0090
pclement@bancroftpllc.com

MICHAEL J. GARCIA
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

*Counsel for Defendant-Appellee*

July 9, 2014

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION**

1. This Brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because, according to the "word count" function of Microsoft Word 2013, the Brief contains 13,990 words, excluding the parts of the Brief exempted from the word count by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

2. This Brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because the Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13-point Century Schoolbook font, with footnotes in 12-point Century Schoolbook font.

Dated: July 9, 2014

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement